AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the
Northern District of New York

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA**<br>**v.**<br>**LUIS MENDEZ,**<br>**SAMUEL MATOS,**<br>**HECTOR SANTIAGO,**<br>**HELBERT CALO-BIRREIEL,**<br>**JOHN RESTO,**<br>**LUIS RESTO, and**<br>**JOSE MEDINA**<br>**Defendants** | ) | Case No. 5:20-MJ- 417 (ATB) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the dates of May 2020 through August 19, 2020 in the county of Onondaga in the Northern District of New York the defendants violated:

| *Code Section* | *Offense Description* |
|---|---|
| Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), (b)(1)(C), and 846 | Conspiracy to distribute and possess with intent to distribute controlled substances, to wit: 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and heroin, a Schedule I controlled substance. |

This criminal complaint is based on these facts:
See Attached Affidavit.

☒ Continued on the attached sheet.

Kelly Baart KB
*Complainant's signature*

Kelly Baart, Task Force Officer, DEA
*Printed name and title*

Attested to by the affiant in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Date: 8/19/2020

Andrew T. Baxter
*Judge's signature*

City and State: Syracuse, New York

Hon. Andrew T. Baxter, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF DEA TASK FORCE OFFICER KELLY BAART**

Kelly Baart, being duly sworn, deposes and says:

## I. INTRODUCTION

1. I am a public servant of the kind specified in the CPL 690.05(1), my title being Police Officer. I have been a sworn member of the Syracuse Police Department since July 18, 2004. I am currently assigned to the United States Department of Justice, Drug Enforcement Administration (DEA) Syracuse Resident Office as a Task Force Officer. I have been a sworn member of the DEA Syracuse Resident Office Task Force since January 2019. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in Title 21, United States Code, Section 801, et. sec. and Title 18, United States Code, Section 2516. I have attended the following trainings/schools: Basic Narcotics Investigations, Informant Management, Interview/Interrogation, Defensive Tactics Instructor, Instructor Development School, Mobile Device Examiner, and Call Detail Records Mapping and Analysis. I have participated in numerous successful investigations into illicit drug distribution networks and have interrogated numerous defendants, informants, and others who were either sellers, distributors, or users of narcotics and other illicit drugs. Also, I have been involved in the monitoring, intercepting, and recording of court-ordered wiretaps, and have participated in numerous search warrants/arrest warrants involving narcotics trafficking. In addition to my above-mentioned experience, I have had the opportunity to speak with and observe other federal, state, and city narcotics officers with regard to the manner in which narcotics are possessed, sold, and distributed in the Syracuse, New York area.

2. I have participated in numerous searches of residences, businesses, and vehicles in which controlled substances, drug paraphernalia, currency, and records were discovered. My experience as well as conversations with other law enforcement officers, as detailed herein, will serve as the basis for any opinions or conclusions set forth below. I have personally participated in the investigation of the offenses set forth below and as a result of my participation and my review of past and present reports made by other Special Agents of the DEA, and other state and local law enforcement agencies, I am fully familiar with the facts and circumstances of this investigation. Additionally, I have participated in several multi-agency narcotics investigations.

3. I submit this affidavit in support of a criminal complaint charging defendants **Samuel MATOS, Luis MENDEZ**, **Hector SANTIAGO, Helbert CALO-BIRRIEL, Luis RESTO, John RESTO,** and **Jose MEDINA** with conspiracy to distribute and possess with intent to distribute controlled substances, to wit: 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), (b)(1)(C), and 846.

4. During the course of these investigations, I have conducted or participated in surveillance, undercover transactions, execution of search warrants, debriefings of informants, and reviews of tape-recorded conversations and narcotics records.

5. I have personally participated in the investigation of the offenses set forth below, which relate to the trafficking of cocaine. As a result of my participation in this investigation, my conversations with Special Agents of the DEA, agents, officers and investigators of other state and local law enforcement agencies, and my review of past and present reports made by others agents,

officers, and investigators, I am fully familiar with the facts, circumstances, and subjects of this investigation. My experience in the investigation of narcotics crimes, as well as my participation in the instant investigation, and conversations with other law enforcement officers, will serve as the basis for any opinions or conclusions set forth below.

## II. BASIS OF INFORMATION

6. As this affidavit is being submitted for the limited purpose of providing probable cause to support charging **Samuel MATOS, Luis MENDEZ**, **Hector SANTIAGO, Helbert CALO-BIRRIEL, Luis RESTO, John RESTO,** and **Jose MEDINA** with conspiracy to distribute and possess with intent to distribute controlled substances, to wit: 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), (b)(1)(C), and 846, I have not included each and every fact known to me concerning this investigation. I set forth only the facts which I believe are necessary to establish probable cause for the issuing of a criminal complaint.

7. Since May 2020, members of the Syracuse Police Department (SPD) and the Drug Enforcement Administration (DEA) have been investigating the cocaine and heroin trafficking activities of **Samuel MATOS, Luis MENDEZ**, **Hector SANTIAGO, Helbert CALO-BIRRIEL, Luis RESTO, John RESTO,** and **Jose MEDINA** and others. The investigation to date has included several controlled purchases of cocaine and heroin, extensive telephone toll analysis, pen registers, physical surveillance operations, monitoring and recording of pole cameras, monitoring of global positioning devices, GPS tracking warrants, narcotics and narcotics proceeds seizures, and lastly, wire and electronic interceptions of **SUBJECT TELEPHONE #3** (utilized by **Luis MENDEZ**) and **SUBJECT TELEPHONE #4** (utilized by **Samuel MATOS**),

collectively **SUBJECT TELEPHONES**, authorized by the Honorable Glenn T. Suddaby, Chief United States District Judge for the Northern District of New York.

8. Pursuant to Court Orders authorizing electronic and wire interceptions, over 14,000 wiretap calls and text messages have been intercepted between **Samuel MATOS, Luis MENDEZ**, **Hector SANTIAGO, Helbert CALO-BIRRIEL, Luis RESTO, John RESTO,** and **Jose MEDINA** and multiple co-conspirators and drug customers over the **SUBJECT TELEPHONES**.

9. As will be discussed in further detail below, intercepted conversations over the **SUBJECT TELEPHONES** corroborate that **Samuel MATOS** and **Luis MENDEZ** are the leaders of this drug organization and are involved in the day to day operations of this criminal enterprise responsible for the distribution of significant quantities of heroin and cocaine in the Northern District of New York.

10. Since June 2020, agents have been monitoring conversations between **Samuel MATOS** and **Luis MENDEZ** and many of their criminal associates. Many of these conversations are drug related. As a result of those interceptions, agents have been able to identify **MATOS** as a local heroin source of supply and **MENDEZ** as a local cocaine source of supply. **MATOS** and **MENDEZ** have been identified as the leaders and organizers overseeing lower level distributors and couriers. Agents have learned that **MENDEZ** is extremely cautious and is familiar with many of the techniques and practices of law enforcement. Physical surveillance has proven challenging due to the organization's use of multiple vehicles, counter surveillance by the targets and the usage of "stash" locations and vehicles to hide narcotics.

11. **Hector SANTIAGO, Luis RESTO,** and **John RESTO** have been identified as **MATOS**' main partners involving the distribution of heroin and cocaine for the organization. **Hector SANTIAGO, Luis RESTO, John RESTO,** and **Samuel MATOS** routinely share the

same group of customers/re-distributors and combine their monies to purchase larger quantities of narcotics.

12. **Helbert CALO-BIRRIEL** and **Jose MEDINA** have been identified as the main distributors/criminal associates of **Luis MENDEZ** involving the distribution of cocaine and heroin for the organization.

13. During this investigation, law enforcement has learned that **MENDEZ** and **MATOS** regularly make decisions and provide direction to their criminal associates regarding the distribution of heroin and cocaine. Agents have also learned that **MENDEZ** and **MATOS** have direct contact with heroin and cocaine suppliers and routinely organize obtaining the re-supply of both heroin and cocaine for their organization.

14. Based upon the large volume of pertinent intercepted drug-related phone conversations in this case, it is clear that **Samuel MATOS, Luis MENDEZ**, **Hector SANTIAGO, Helbert CALO-BIRRIEL, Luis RESTO, John RESTO,** and **Jose MEDINA** have profited substantially from the illegal trafficking of heroin and cocaine in the Northern District of New York. The following calls and surveillance operations are a sampling of drug-related conversations and overt acts in furtherance of the conspiracy and are submitted as evidence of the organization's drug trafficking activities. These are submitted by your affiant to establish probable cause in support of issuing a criminal complaint. Under the totality of the circumstances, your affiant believes that the conversations provided below are consistent with the analysis set forth above.

15. On Thursday, June 11, 2020 at approximately 1:57 p.m., an incoming call (call #135) was intercepted on **SUBJECT TELEPHONE #3** between **Luis MENDEZ** and an

identified male, utilizing XXX-XXX-8751 (hereinafter "IM8751"). This call was in English. The following is a transcript of that call:

**MENDEZ:** Yeah

IM8751**:** You on Richmond buddy?

**MENDEZ:** Yeah

IM8751**:** Alright, I'm about to come see you.

**MENDEZ:** Who this?

IM8751**:** White man.

**MENDEZ:** Oh yeah, you gotta give me like, like, like, 25 minutes cause I gotta go grab the thing. It's in the other house. [Unintelligible] What you, what you wanted?

IM8751**:** [Unintelligible] I wanted to see you, wanted to do three for the 150.

**MENDEZ:** Fine. Let me get, let me get to the other house and then on my way back I'll call you cause I have to check out much I have left over there.

IM8751**:** [Unintelligible] I'll take whatever you got left.

**MENDEZ:** Alright, I'll do that. I'll let you know right away.

IM8751**:** Alright.

**MENDEZ:** Bye.

[End of call]

16. At approximately 2:16 p.m., your affiant observed **MENDEZ** exit N. Geddes Street with Hispanic males identified as **Helbert CALO-BIRRIEL** and **Hector SANTIAGO** and enter a white Chevrolet Impala, displaying Texas registration LZV-8614. Surveillance units followed the Chevrolet Impala directly to Campbell Road in Mattydale, NY.

17. At approximately 2:27 p.m., after surveillance units observed **MENDEZ, CALO-BIRRIEL,** and **SANTIAGO** arrive in the area of Campbell Road, an outgoing call (call #136) was intercepted on **SUBJECT TELEPHONE #3** between **MENDEZ** and **CALO-BIRRIEL**, utilizing XXX-XXX-2337. This call was in Spanish. The following is an English transcript of a portion of that call:

**MENDEZ:** The vehicle right?

**CALO-BIRRIEL:** Yeah.

**MENDEZ:** [Unintelligible] dude?

**CALO-BIRRIEL:** I'm keeping an eye on it because it has people in it.

**MENDEZ:** Huh?

**CALO-BIRRIEL:** Is parked in front of a house.

**MENDEZ:** Yes?

**CALO-BIRRIEL:** On the street.

**MENDEZ:** Is the same one, right? The same one that was following us before.

**CALO-BIRRIEL:** Same one. What I'm going to do is when I walk by it, I will take a look inside [ASIDE: It moved?] It moved.

**MENDEZ:** It moved?

**CALO-BIRRIEL:** Yes.

**MENDEZ:** That's, that's [Pause] they are watching us.

[End of Call]

18. At approximately 2:28 p.m., SPD Det. Ripley observed the Chevrolet Impala leave Campbell Road. At approximately 2:53 p.m., your affiant observed **CALO-BIRRIEL** arrive at Richmond Avenue and N. Geddes Street on foot, while on the phone and walking into XXX N. Geddes Street. At that time, an outgoing call (call #140) was intercepted on **SUBJECT**

**TELEPHONE #3** between **MENDEZ** and **CALO-BIRRIEL**, utilizing XXX-XXX-2337. This call was in Spanish. The following is an English transcript of that call:

**CALO-BIRRIEL:** I'm coming up.

**MENDEZ:** Are you coming up?

**CALO-BIRRIEL:** Yes everything is empty over here.

**MENDEZ:** Hello?

**CALO-BIRRIEL:** I'm coming up right now.

**MENDEZ:** Alright.

**CALO-BIRRIEL:** Alright, this is empty here.

[End of call]

19. At the same time, your affiant observed the white Chevrolet Impala turn onto Richmond Avenue from N. Geddes Street. Your affiant observed **SANTIAGO** exit XXX N. Geddes Street carrying a black satchel around his shoulder. Your affiant observed **CALO-BIRRIEL** walk down the driveway of 315 Richmond Avenue (a vacant house). The Chevrolet Impala parked in the 300 block of Richmond Avenue, **MENDEZ** and **SANTIAGO** exited the vehicle and walked towards XXX N. Geddes Street. At approximately 2:57 p.m., **CALO-BIRRIEL** emerged from down the driveway and caught up to **MENDEZ** and **SANTIAGO** on the sidewalk in front of 315 Richmond Avenue. Your affiant observed **SANTIAGO** carrying a small paper bag in his right hand. All three (3) males walked to XXX N. Geddes Street, where **CALO-BIRRIEL** removed a set of keys from the black satchel and gave them to **SANTIAGO**. **SANTIAGO** then entered XXX N. Geddes Street with the paper bag. At approximately 2:59 p.m., **SANTIAGO** exited XXX N. Geddes Street without the paper bag.

20. At approximately 3:08 p.m., an outgoing call (call #141) was intercepted on **SUBJECT TELEPHONE #3** between **Luis MENDEZ** and IM8751, utilizing XXX-XXX-8751. The following is a transcript of that call:

IM8751**:** Yo

**MENDEZ:** You got my text?

IM8751**:** Huh? My phone broke I gotta use the car.

**MENDEZ:** Come through.

IM8751**:** Alright, I'm coming.

[End of call]

21. At approximately 3:25 p.m., your affiant observed IM8751arrived at XXX N. Geddes Street in a Toyota Tacoma, displaying Virginia registration URY-2890. IM8751exited the driver's seat of the Tacoma and then entered XXX N. Geddes Street. At approximately 3:28 p.m., your affiant observed IM8751 exit XXX N. Geddes Street, get into the Toyota Tacoma, and leave the area.

22. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes IM8751contacted **MENDEZ** (call #135) asking to purchase three (3) grams of powder cocaine in exchange for $150. **MENDEZ** told IM8751that he had to go to another house to get the product (i.e. cocaine) and would call him back. Your affiant believes **MENDEZ** traveled with **CALO-BIRRIEL** and **SANTIAGO** to Campbell Road, Mattydale, NY to retrieve the cocaine. Your affiant further believes that **MENDEZ** detected law enforcement on surveillance and was warning **CALO-BIRRIEL** that there was a car on the street, the same one that followed them earlier. Due to **MENDEZ** identifying the surveillance, your affiant believes **MENDEZ** was attempting to avoid police detection, consequently dropping off **CALO-BIRRIEL**

a distance away from XXX N. Geddes Street so **CALO-BIRRIEL** could check the area for additional law enforcement. **MENDEZ** called **CALO-BIRRIEL** to see if it was safe for **MENDEZ** to arrive in the area with the cocaine.

23. Your affiant believes **CALO-BIRRIEL** retrieved the satchel from within the residence and “stashed” a portion of the narcotics near the vacant house at 315 Richmond Avenue. Your affiant has received information from numerous confidential sources stating it is common for those involved in the distribution of narcotics at XXX N. Geddes Street to “stash” quantities of narcotics outside of 315 Richmond Avenue (a vacant house) to avoid police detection. Your affiant also believes **SANTIAGO** was carrying a paper bag containing illegal narcotics, as the unknown male walked directly into XXX N. Geddes Street with the paper bag and two minutes later exited the residence without the paper bag. Your affiant believes that **MENDEZ** then contacted IM8751 (call #141) to tell IM8751to come over because **MENDEZ** had the cocaine. Based on your affiant’s training and experience, your affiant knows the aforementioned actions are consistent with those of individuals involved in the distribution of illegal narcotics to avoid police detection.

24. On June 12, 2020, at approximately 4:16 p.m., an incoming call (call #187) was intercepted on **SUBJECT TELEPHONE #3** between **Luis MENDEZ** and **Samuel MATOS**, utilizing **SUBJECT TELEPHONE #4**. This call was in Spanish. The following is an English transcript of that call:

**MENDEZ**: Yo

**MATOS**: Hey man, are still with the girls?

**MENDEZ**: No, not anymore.

**MATOS**: You dropped them off. Hey do you have anything left of that?

**MENDEZ**: Man, what I had [Stutters]. I'm dry.

**MATOS**: Of the [Unintelligible] do you have any left of that?

**MENDEZ**: I'm out, man.

**MATOS**: Damn, I'm hitting up State [Phonetic] but he is fronting I don't know. Because he says that sells a lot, man. I don't know; he is asking 6-5, you know, onions.

**MENDEZ**: Tell him to give you a discount what you have to give him.

[Voices overlap]

**MATOS**: No, I told him that if he can, to give it to me for 900, 950.

**MENDEZ**: 950?

**MATOS**: Um-huh because... [Unintelligible] I have a ton of people calling me but I don't have anything.

**MENDEZ**: Man, I don't have shit either, brother.

**MATOS**: Don't even tell me about next week, but hey, I made contact with a guy from the Bronx, I'm going to talk to you later. And then I'm going to talk to you about the other thing.

**MENDEZ**: Yes?

**MATOS**: You are going to laugh, you are going to laugh at this, and I didn't know this man lives next to me and Sol [Phonetic].

**MENDEZ**: Um-Huh.

**MATOS**: [Unintelligible] man, the house is hidden, like mine that looks very hidden so is his.

**MENDEZ**: Oh yes?

**MATOS**: Yes, man. I'm going to show you, all I'm going to tell you is 106 Jasper.

**MENDEZ**: Um-huh.

**MATOS**: That's where it's kept.

**MENDEZ**: Yes that's probably right because it's well hidden.

**MATOS**: Man is well hidden, man. You can't imagine that he lives there, no one knows he lives there man. Is so hidden like alley, I don't even know how to explain it is like a... well-hidden wait until you see it. [Aside: Don't Cry papi don't cry] I'll call you back man.

**MENDEZ**: Talk to that dude.

[Baby/child crying]

**MATOS**: Already.

[End of Call]

25. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes that in the above conversation, **MENDEZ** and **MATOS** discuss being out of narcotics ("dry"). **MATOS** tells **MENDEZ** that he talked to another male about getting five (5) or six (6) ounces ("onions") of cocaine for $900 or $950 per ounce. **MATOS** also tells **MENDEZ** that he has a possible new cocaine source of supply from the Bronx.

26. On June 18, 2020, at approximately 4:16 p.m., agents intercepted a call between **Luis MENDEZ** and **Samuel MATOS**, utilizing **SUBJECT TELEPHONE #4**. During the call, **MATOS** indicated that he recently spoke with a source of supply from the Bronx and wanted to discuss the opportunity further with **MENDEZ** in person.

27. At approximately 6:00 p.m., while conducting surveillance in front of **MATOS'** residence on Highland Street, SPD Det. Ripley observed a gray Honda Pilot, bearing New Jersey license plate R57MJN, arrive and park on the street in front of the residence. Two Hispanic males exited the vehicle and walked toward the residence.

28. At approximately 6:09 p.m., Det. Ripley observed a red Volkswagen Jetta, bearing New York registration JLK1860, arrive and park behind the Honda Pilot. **Samuel MATOS** exited the front passenger seat of the Volkswagen Jetta and shook hands with the driver of the Honda Pilot and the unknown Hispanic male. **MATOS** held a cellular telephone in his hand during this

interaction, which appeared to display an ongoing "FaceTime" call with an unidentified person. **MATOS**, and the two Hispanic males from the Honda Pilot, all entered the side porch door of **MATOS'** residence on Highland Street.

29. At approximately 6:14 p.m., Det. Ripley observed the driver of the Honda Pilot exit the side porch door of Apartment #1 and return to the driver's seat of the Honda Pilot.

30. At approximately 6:15 p.m., Det. Ripley observed the driver of the Honda Pilot exit the Honda Pilot and re-enter the side porch door of **MATOS'** residence on Highland Street. Det. Ripley noted that the driver of the Honda Pilot was observed carrying what appeared to be a black plastic shopping bag. At approximately 6:16 p.m., an unknown white male exited the driver's seat of the red Volkswagen Jetta and entered the side porch door of **MATOS'** residence on Highland Street. At approximately 6:20 p.m., the unknown white male exited the side porch door of **MATOS'** residence on Highland Street, returned to the driver's seat of the red Volkswagen Jetta, and departed the area.

31. At approximately 6:30 p.m., Det. Ripley observed a gold Buick LeSabre, bearing New York registration GJF4593, park in front of **MATOS'** residence on Highland Street. Two males identified as **John RESTO** and **Luis RESTO** exited the Buick and entered the front (right) door of the **MATOS'** residence. These males (**John RESTO** and **Luis RESTO**) were identified by SPD Det. Ripley utilizing Onondaga County Booking Photographs.

32. At approximately 6:41 p.m., Det. Ripley observed the driver of the Honda Pilot and the unknown Hispanic male exit the side porch door of **MATOS'** residence on Highland Street. The driver of the Honda Pilot entered the driver's seat of his Honda Pilot and the Hispanic male entered the front passenger's seat.

33. At approximately 6:42 p.m., Det. Ripley observed **John RESTO** and **Luis RESTO** exit the front right door of **MATOS'** residence on Highland Street, and return to the Buick LeSabre.

34. At approximately 6:43 p.m., Det. Ripley observed **MATOS** exit the front (right) door of his residence on Highland Street and walk to the Buick LeSabre to speak to **John RESTO** and **Luis RESTO**. **MATOS** then walked to the Honda Pilot and entered the rear driver's side door of the vehicle. At this time, both the Honda Pilot and the Buick LeSabre departed the area. Neither the driver of the Honda Pilot, the unknown Hispanic male, **Luis RESTO**, **John RESTO**, nor **MATOS** exited the residence with the black plastic bag carried in by the driver of the Honda Pilot. Approximately one minute later, Det. Ripley observed the Honda Pilot enter the parking lot of a convenience store located on Butternut Street, at the intersection of Grassman Avenue. All three occupants of the Pilot exited the vehicle and entered the convenience store.

35. At approximately 6:48 p.m., Det. Ripley observed all three subjects return to the Honda Pilot, each carrying a black plastic. The Honda Pilot then departed the area.

36. At approximately 6:58 p.m., Det. Ripley observed the Honda Pilot turn onto Richmond Avenue and park in the area of 315 Richmond Avenue. The driver of the Honda Pilot, the unknown Hispanic male, and **MATOS** exited the vehicle and walked up to and entered XXX N. Geddes Street. At the time, **MATOS** carried what appeared to be the same black plastic bag he carried out of the convenience store inside of the residence.

37. At approximately 7:10 p.m., Det. Ripley observed the driver of the Honda Pilot, the unknown Hispanic male, and **MATOS** exit XXX N. Geddes Street, return to the Pilot, and depart the area. **MATOS** was carrying the same black plastic bag from the convenience store.

38. At approximately 7:15 p.m., SPD Det. Rathbun observed the Honda Pilot park in the driveway of a residence on Gifford Street. At approximately 7:25 p.m., SPD Det. Rathbun and SPD Det. Cowan observed the Honda Pilot depart Gifford Street. Agents followed the Honda Pilot as it travelled onto Interstate 690 east and then Interstate 81 south.

39. At approximately 7:25 p.m., an incoming call (call #513) was intercepted on **SUBJECT TELEPHONE #3** between **Luis MENDEZ** and **Samuel MATOS**, utilizing **SUBJECT TELEPHONE #4**. The following is a transcript of that call:

**MENDEZ**: Hello?

**MATOS**: Hello.

**MENDEZ**: Hello .

**MATOS**: [Aside: Check if it's going to piss [Repeats]] Hello?

**MENDEZ**: Huh?

**MATOS**: Look, man, don't tell me about those guys, those mother fuckers.

**MENDEZ**: Man, those people are supposedly down there at Rosa's house disrespecting everyone and playing in front of the kids, man. What's wrong with that man, dude? Man, I don't want to deal with that shit. No, no, man, I don't want that shit, things are not like that, man.

[Voices overlap].

**MATOS**: Chepe [Phonetic], Chepe, right? It was Chepe?

**MENDEZ**: Yes. Man, no no.

**MATOS**: That's exactly why I left; that's exactly why I left right there. I told him "Mother fucker, you are acting up."

**MENDEZ**: No, no, man, not like that. He is really going to have to leave, he is going to have to look where to leave to, straight up.

**MATOS**: Listen, listen to me, man. I told him "You are acting up, bring it down." Man. I brought my connection looking for you, right? To be introduced, you know, all those people from New York. That guy comes out with some stupid shit talking

about “cocksucker." I told him "Chepe I'm going to smack you up, cut the shit. You are acting up Chepe, bring it down Chepe." You know what I said "Gordo, I'm leaving. This guy is an ignorant." Now they brought me 50 BR and a couple other cool things, man.

[Voices overlap]

**MENDEZ**: Disrespecting everyone there

**MATOS**: No, no, I left, man, I'm here at Chana's [Phonetic] house, man. Come get me if you want. Not Chana [Phonetic], Marylou's [Phonetic] house. Because they pissed me off, because he was really ignorant. I was with Jari [Phonetic] and with those people there, man, because I fucking left.

[Voices overlap]

**MATOS**: Really ignorant

**MENDEZ**: Alright alright.

**MATOS**: Come get me here, come get me here if you want. I'll go with you.

[End of Call]

40. Agents reviewed data regarding the Honda Pilot from a collection of automatic license plate reader systems and learned the following:

a) At approximately 2:13 p.m., New York State automatic license plate readers captured an image of the Honda Pilot travelling northbound on Interstate 87, at the 16.3 mile marker.

b) At approximately 2:48 p.m., New York State automatic license plate readers captured an image of the Honda Pilot travelling westbound on New York State Route 17, at the Bakertown Road overpass.

c) At approximately 4:46 p.m., New York State automatic license plate readers captured an image of the Honda Pilot travelling northbound on Interstate 81, near Binghamton, NY.

d) At approximately 8:38 p.m., New York State automatic license plate readers captured an image of the Honda Pilot travelling on Interstate 81 southbound, near Binghamton, NY.

e) At approximately 9:04 p.m., New Jersey State Police automatic license plate readers captured an image of the Honda Pilot travelled eastbound on Interstate 80, near the Worthington State Forest.

f) A review of a commercial license plate reader system utilized by law enforcement revealed the vehicle was frequently parked in the overnight/early morning hours in the Bronx, NY.

41. Based on all of the above, agents believe the driver of the Honda Pilot is **MATOS'** heroin source-of-supply and is based in the Bronx, New York. Agents believe that on June 18, 2020, the driver of the Honda Pilot delivered an unknown quantity of heroin to the **MENDEZ/MATOS DTO** at **MATOS'** residence on Highland Street.

42. On June 28, 2020, at approximately 2:13 p.m., agents intercepted an outgoing telephone call between **MENDEZ**, utilizing **SUBJECT TELEPHONE #3** and **MATOS**, utilizing **SUBJECT TELEPHONE #4**. During this phone call, **MENDEZ** tells **MATOS** that he has to go get "point 4 grams." **MATOS** tells **MENDEZ** that he doesn't have anything loose and that he has it at the "R" (believed by your affiant to be a reference to the Richmond Avenue residence). **MATOS** was confused about the quantity of drugs requested and **MENDEZ** confirms that he needs "point 4 grams." **MATOS** tells **MENDEZ** when he gets there, **MENDEZ** will have to "prep that yourself" (meaning **MENDEZ** would have to measure out the heroin himself). **MENDEZ** tells **MATOS** that he's on his way to **MATOS'** residence on Highland Street.

43. At approximately 2:23 p.m., SPD Det. Cinque observed **MENDEZ**, **Helbert CALO-BIRRIEL,** and **Hector SANTIAGO** exit XXX N. Geddes Street, and enter a red Ford Escape bearing Ohio registration IYJ040, and leave the area.

44. At approximately 2:30 p.m., Det. Cinque observed the Ford Escape arrive at **MATOS'** residence on Highland Street. At the same time, agents intercepted an outgoing telephone call between **MENDEZ**, utilizing **SUBJECT TELEPHONE #3** and **MATOS**, utilizing **SUBJECT TELEPHONE #4**. During this phone call, **MENDEZ** tells **MATOS** that he is there.

45. At the same time, Det. Cinque observed **MENDEZ** exit the Ford Escape and enter the side door of **MATOS'** residence on Highland Street.

46. At approximately 2:37 p.m., Det. Cinque observed **MENDEZ** exit **MATOS'** residence on Highland Street, enter the Ford Escape, and leave the area.

47. At approximately 2:47 p.m., Det. Cinque observed the Ford Escape arrive at the **MENDEZ's** residence. **MENDEZ, CALO-BIRRIEL,** and **SANTIAGO** entered XXX N. Geddes Street.

48. Surveillance was terminated at this time. Based on your affiant's training, experience, and knowledge of this investigation, agents believe **MENDEZ** had a customer who asked to purchase "point 4 grams" of "loose" heroin (meaning unpackaged). Agents believe **MENDEZ** did not have the heroin at XXX N. Geddes Street, and called **MATOS** to see if he could go get the narcotics from **MATOS**. **MATOS** and **MENDEZ** had a discussion regarding the quantity of heroin **MENDEZ** needed, and **MATOS** stated he could go to his residence on Highland Street to retrieve the heroin, however he would have to "prepare" it himself (meaning measure out the heroin himself).

49. On June 29, 2020, at approximately 10:12 a.m., an incoming call (call#1216) was intercepted on **SUBJECT TELEPHONE #3** between **Luis MENDEZ** and an unknown male, utilizing XXX-XXX-0708 (hereinafter, "UM0708"). The following is a transcript of that call:

**MENDEZ:** Yo

UM0708**:** Yo, Prow, what's up man? I need my, I need that from you, I need my thing from you.

**MENDEZ:** Thought you never came yesterday, what happened?

UM0708**:** I came yesterday, but you, you, you wasn't there. What time, can I come about today, about an hour, can I come now?

**MENDEZ:** Are, are you close by? Cause I'm like, jump in highway man. I should go soon, but I, I can have my boy give it to you right now.

UM0708**:** Yeah, do that, do that and I can, I can pick it up in twenty minutes. Who, who y'all want come see, who, who y'all want me to come [Unintelligible]?

**MENDEZ:** Just come to the stairs and I have 'em, I have, my, I have my my puffy, um one with the puffy hair, I give it to you.

UM0708**:** Okay, the dude with the afro?

**MENDEZ:** Yeah, he'll know where he's at

UM0708**:** Alright, and tell him don't fuck with it either, though, because I know he likes to do stupid shit.

**MENDEZ:** Man, he dumb man.

UM0708**:** Alright, alright, alright, I'll [Unintelligible] for him, thanks, thanks I appreciate you man.

**MENDEZ:** Yeah, yeah, yeah. Alright.

UM0708**:** Alright, I'm coming in twenty minutes though.

**MENDEZ:** Alright

[End of Call]

50. At approximately 10:14 a.m., an outgoing call (call#1218) was intercepted on **SUBJECT TELEPHONE #3**, between **Luis MENDEZ** and **Jose MEDINA**, utilizing XXX-XXX-3432. This call was in Spanish. The following is an English transcript of that call:

**MENDEZ:** [Aside: [Unintelligible] whatever]

**MEDINA:** Hello?

**MENDEZ:** Where are you?

**MEDINA:** Me? Here at home.

**MENDEZ:** Go to the cabinet over there.

**MEDINA:** Tell me.

**MENDEZ:** Two of the white stuff that are apart should be together, check it out. [Pause] The ones you took the day before yesterday.

**MEDINA:** Yes.

**MENDEZ:** Those are together, put those aside, not those, in the corner, in the corner to the cabinet, the, the, the one that looks like a creamy white.

**MEDINA:** There's a big one.

**MENDEZ:** There's a big one and there's a little one, Vico.

**MEDINA:** Yes, what's up with this one?

**MENDEZ:** There's one that's all alone, you see that it's alone?

**MEDINA:** Yes, the [unintelligible] ones?

**MENDEZ:** There's, there's two, two, two that are apart, and the ones with the hand bags. Not those, leave those aside. There's one I left in the corner of the cabinet.

**MEDINA:** Yes [Unintelligible].

[Voices Overlap]

**MENDEZ:** Looks like I'll have to go there myself since this will get crazy and [Unintelligible] asshole. That guy's coming, the guy with the big teeth.

**MEDINA:** I took, I got the one that was alone in the corner.

**MENDEZ:** If you look at it, you'll see it has some small black balls inside, check it out.

**MEDINA:** Yes.

**MENDEZ:** Yeah, it looks like black pebbles. [Pause] Did you see it?

**MEDINA:** Um [Unintelligible]

**MENDEZ:** I'm, I'm, I'm already here around the corner, so I can give it to you.

**MEDINA:** Alright then.

[End of Call]

51. At approximately 10:21 a.m., SPD Det. Cinque observed **Jose MEDINA** exit the entrance door which leads to apartment #3 at XXX N. Geddes Street. SPD Det. Cinque observed **MEDINA** standing in front of 315 Richmond Avenue.

52. Based on your affiant's training, experience, and knowledge of this investigation, agents believe a customer (UM0708) contacted **MENDEZ** to purchase a quantity of cocaine. **MENDEZ** told the customer he wasn't home, but he would have "his boy" (referring to Jose **MEDINA**, aka "Vico") handle the transaction. **MENDEZ** directed the customer to XXX N. Geddes Street. One minute later, **MENDEZ** then called **Jose MEDINA** and directed him to a cabinet where he (**MENDEZ)** stores the narcotics.[1] **MENDEZ** explained to **MEDINA** that a customer (the guy with the big teeth) is going to come over to purchase a quantity of narcotics.

53. On June 30, 2020, at approximately 11:06 a.m., an outgoing call (call #277) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and an identified female,

[1] Your affiant has learned during this investigation that **MENDEZ** and **MEDINA** both reside in apartments located at XXX N. Geddes Street.

utilizing telephone number XXX-XXX-1804 (hereinafter "IF1804"). This call was in Spanish.

The following is an English transcript of the call:

**MATOS**: Yo

IF1804**:** I came here to his workplace to insult him because he wasn't there, but he said [PAUSE] that doesn't have my name, only the address and is under the name of Alexis. And I was like, but are you crazy! Putting down your name in that [Unintelligible] name.

**MATOS**: Do you believe him?

IF1804**:** Huh?

**MATOS**: Do you believe him?

IF1804**:** He doesn't even know [PAUSE]. He is retarded [Unintelligible].

[Voices Overlap]

**MATOS**: No, but that [PAUSE]

[Voices Overlap]

IF1804**:** I do believe him. He showed me that thing.

**MATOS**: Still. If [PAUSE] the name doesn't matter

[Voices Overlap]

IF1804**:** I insulted him last time because he is crazy! Because he didn't know the content. So he was like okay, okay [PAUSE]. He got one yesterday, at his house. And [PAUSE] I was like be careful! There are cameras there!

**MATOS**: [Unintelligible]

[Voices Overlap]

IF1804**:** I told him, don't do it again. I was like [PAUSE] I have, I had to go his job because I was not going to stay quiet about it. I'm desperate.

**MATOS**: Did he paid you?

IF1804**:** Huh?

**MATOS**: Did he paid you?

IF1804**:** He is going to pay me when he leaves.

**MATOS**: His house?

IF1804**:** He is at his workplace. He is going to leave now.

**MATOS**: Oh you went to his work?

IF1804**:** Yes. I went there to insult him.

**MATOS**: Okay. And why didn't he, didn't pay you right there?

IF1804**:** He is supposed to give me the money, but there were a lot of people there. All the guy that hang around with him were there and other people that I know.

**MATOS**: The money comes right there inside of the package

IF1804**:** Ah, no, no. It didn't come.

**MATOS**: The money didn't come?

IF1804**:** And if it's there, I'm not going to touch it. I'm going to leave it right there.

**MATOS**: You can leave it alone until 3 [PAUSE]. 5 the latest.

IF1804**:** I think he leaves around [PAUSE] 2 or 3. But he said that it didn't come.

**MATOS**: [Unintelligible]

[Voices Overlap]

IF1804**:** He didn't put my name down because he didn't know [PAUSE]

[Voices Overlap]

**MATOS**: The name doesn't matter. What matters is the address.

IF1804**:** I said, you know that's not mine and I never [PAUSE]…There are cameras there and I never took anything.

**MATOS**: If you see a package that has arrived there [PAUSE], just kick it to the side and wait for him to come and get it. [Background: Loud voices] You heard?

IF1804**:** Huh?

**MATOS**: [Coughs] Don’t bring it inside of your house.

IF1804**:** To not bring it inside of my house?

**MATOS**: If he gets the package, don’t let him go inside of your house.

IF1804**:** No, he is not going to come inside of my house at all. I won’t let him.

**MATOS**: My titi (Aunt) is going to make rice, chicken salad [PAUSE], something like that with beans and something else because Carly [PHONETIC] is coming.

IF1804**:** [Laughs] [Unintelligible] because Carly is coming.

**MATOS**: I think [PAUSE].

IF1804**:** [Unintelligible]

**MATOS**: Him

IF1804**:** I’m going later.

**MATOS**: Okay, girl, you [Unintelligible] [PAUSE] Hello?

IF1804**:** No. I just home home now.

**MATOS**: Call and see what he says.

[Voices Overlap]

IF1804**:** [Unintelligible]

**MATOS**: Who?

IF1804**:** Oh, hold on! Hold on! I just texted her and she sent me an audio and I haven’t heard it yet.

**MATOS**: [Unintelligible]

IF1804**:** Your phone is acting weird.

**MATOS**: Remember the phone payment is due today.

IF1804**:** But it shouldn’t [PAUSE]

**MATOS**: They act like that when the payment is due. Even the internet is fucked up.

IF1804**:** Oh my God, I'm stressed out

**MATOS**: Okay

IF1804**:** Okay

[End of call]

54. Your affiant and other agents believe that in the above conversation **MATOS** and IF1804 discuss a package that was set to be delivered on or about July 1, 2020, addressed to "Alexis,' but with an address unaffiliated with any individual with the name "Alexis." However, the address on the package was to IF1804. Agents believe that the recipient (IF1804) would be paid to receive the parcel, and that the recipient (IF1804) was being told not to pick the parcel up, and rather to leave it for a few hours. Also, during the intercepted conversation, agents overheard **MATOS** telling IF1804 not to bring the parcel inside the house, and to avoid letting another person inside of the house (presumably the person picking the parcel up from the intended recipient). Agents believe the package was coming from Puerto Rico because the toll records retrieved as part of this investigation indicated numerous communications between target subjects and (787) telephone prefixes, a Puerto Rico telephone exchange.

55. On June 30, 2020, your affiant contacted United States Postal Investigator (USPI) Matt Puro and advised him of DEA's ongoing investigation into drug trafficking, and in sum and substance, your affiant provided USPI Puro with the details of the telephone conversation listed above. Postal Inspectors queried US Postal Service and US Postal Inspection Service information and were unable to locate any inbound parcels from Puerto Rico that bore the delivery name of "Alexis." Postal Inspectors were able to determine that U.S. Postal Service Priority Mail Express Parcel EJ134637275US (Parcel) was enroute to an address on Wyoming Street, Syracuse, New

York, weighed 7 pounds, bore postage in the amount of $87.75, and was paid for in cash. That package was of interest given the recipient location, being in Syracuse, NY, and the only package of a list of packages that was being sent from Puerto Rico to Syracuse overnight, having been paid for in cash. However, Postal Inspectors were unable to observe the delivery name on the parcel, and were unsure if the parcel was related to the information provided by your affiant. Postal Inspectors made note to review the parcel the following morning.

56. On July 1, 2020, Postal Inspectors contacted US Postal Service management at the Franklin Square Station Post Office in Syracuse, NY and learned that parcel EJ134637275US (addressed to an address on Wyoming Street, Syracuse, New York) had arrived for normal processing and delivery. The parcel was addressed to "**Alexis Quinones, 410 Wyoming Street, Syracuse, NY 13204**," the same first name referenced in the telephone call detailed in the above conversation. USPI Puro contacted your affiant with that information, and your affiant advised USPI Puro that the address of Wyoming Street, Syracuse, NY was previously unknown to be associated with this investigation. Your affiant then directed an investigator to surveil the address and, a short time later, your affiant learned that a vehicle known to be related to the drug trafficking investigation, a Toyota Camry displaying Texas registration 954936b, was observed parked on the roadway in front of the address, and utilized by IF1804. Your affiant then reported this information to USPI Puro.

57. On that same day (July 1, 2020) Postal Inspectors responded to the Franklin Square Post Office in Syracuse, NY and secured parcel EJ134637275US for further investigation. The parcel bore the return name and address of Javier Quinones, c/Jefferson #113, San Juan Puerto Rico, 00926 and was addressed to Alexis Quinones, XXX Wyoming Street, Syracuse, NY 13204. The parcel was mailed from Puerto Rico on June 29, 2020, which was similar to information your

affiant had provided which indicated a parcel was expected to be delivered on June 30 or July 1, 2020. The parcel was secured by Postal Inspectors for further investigation.

58. On July 2, 2020, United States Magistrate Judge Andrew T. Baxter signed a federal search warrant for the parcel. Following execution of the search warrant, agents located a second box (US Priority Box) with the parcel that contained a grey Ozark Trail brand cooler. Inside of the cooler were two (2) brick shaped objects wrapped in green cellophane, freezer bags, dryer sheets, sprayed in cologne and heat sealed in freezer bags. One brick was stamped "H-E" and one brick was stamped with an image that appeared to be a bell. The brick with the image of a bell was also wrapped in tin foil. A sample of the substance was field tested utilizing a Nark 2 test kit and both tested positive for the presence of cocaine. Your affiant field tested the brick that had the image believed to be a bell and USPI Puro field tested the brick with the “"H-E” stamp.

59. On July 25, 2020, at approximately 3:24 p.m., an incoming call (call #2952) was intercepted on **SUBJECT TELEPHONE #3** between **Luis MENDEZ** and **Helbert CALO-BIRRIEL**, utilizing telephone number XXX-XXX-2337. This call was in Spanish. The following is an English transcript of the call:

**MENDEZ**: Hello?

**CALO-BIRRIEL:** Talk to me. Look…

**MENDEZ**: Tell me.

**CALO-BIRRIEL:** We are coming over now.

**MENDEZ**: Aha.

**CALO-BIRRIEL:** We are going down here.

**MENDEZ**: Over here?

**CALO-BIRRIEL:** Yes.

**MENDEZ**: Oh, ok, ok.

**CALO-BIRRIEL:** We went around and he said he was going to get us later in the week.

**MENDEZ**: Oh yeah?

**CALO-BIRRIEL:** Oh, yes, he is gonna get us when he gets here. So it doesn't look like a lot.

**MENDEZ**: If it gets heated up, yes, you know if they see new faces, that's dangerous dude.

**CALO-BIRRIEL:** Exactly.

[Voices Overlap]

**MENDEZ**: Uh huh.

**CALO-BIRRIEL:** Because since we already saw everything.

**MENDEZ**: How is it?

**CALO-BIRRIEL:** That we saw everything already. [Unintelligible] down there and check it out.

**MENDEZ**: Ok [Pause] when you get here, we'll talk about the other thing because I think that the other thing they sent it back. They sent it back to…to "BM."

[Voices Overlap]

**CALO-BIRRIEL:** [unintelligible]

**MENDEZ**: So we need to see. I think Monday, Monday it was arriving Monday. I don't know something like that.

[Voices Overlap]

**CALO-BIRRIEL:** Alright, you know if I'm around there, I'll get it.

**MENDEZ**: Dude that what? When the mail man leaves it, we go get it and if he wants to stick with us over there. We gave him push that he will eat his ear [Laughs].

**CALO-BIRRIEL:** [Unintelligible] [Aside: [Unintelligible] or, or]

**MENDEZ**: Anyways, alright, we'll talk here.

**CALO-BIRRIEL:** Ok, buddy

**MENDEZ**: Alright

**CALO-BIRRIEL:** Alright

[End of Call]

60. Based on your affiant's training, experience, and knowledge of this investigation, agents believe **MENDEZ** and **CALO-BIRRIEL** talk about possibly stealing a parcel from the mail man that was arriving on Monday. **MENDEZ** also talks about "the other thing they sent it back." Agents believe **MENDEZ** was referring to the parcel that was intercepted (detailed above) that the **MATOS/MENDEZ DTO** did not receive.

61. In the third and fourth week of July 2020, intercepted calls on **MATOS'** cellular telephone (**SUBJECT TELEPHONE #4**) indicated that **MATOS** intended to travel to New York City to obtain a resupply of heroin. **MATOS** indicated he would collect money from co-conspirators to purchase a larger quantity of heroin from a New York City source of supply.

62. On July 21, 2020, at approximately 9:36 a.m., your affiant observed **Luis RESTO** walk from the northwest corner of his residence on Lakeview Avenue and enter the driver's seat of a green Buick LeSabre, bearing New York license plate GJF4593. A few minutes later, **Luis RESTO** departed the area in the Buick LeSabre. At approximately 10:03 a.m., your affiant observed the Buick LeSabre park in a parking lot across from the **RESTO** residence on Lakeview Avenue. **Luis RESTO**, **John RESTO,** and an unidentified black male and unidentified black female exited the Buick and walked towards the northwest corner of the **RESTO** residence on Lakeview Avenue, out of view.

63. At approximately 10:07 a.m., **John RESTO**, **Luis RESTO**, the unidentified black male and unidentified black female walked from the northwest corner of the **RESTO** residence on

Lakeview Avenue to hang out at the northeast corner and front yard area of the residence.

64. At approximately 10:09 a.m., an incoming call (call #5209) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **Luis RESTO**, utilizing telephone number XXX-XXX-7957. Agents confirmed **Luis RESTO** utilized this telephone number when agents placed a controlled call on July 8, 2020, at 4:59 p.m. to XXX-XXX-7957 and observed **Luis RESTO** answer the telephone call. This call was in Spanish. The following is an English transcript of the call:

**RESTO**: Right now I have a problem, I gotta wait for her to get out on break at 10:30. [Unintelligible] I'm going to go get the card to take the money out.

**MATOS**: At what time?

**RESTO**: Wait until 10:30 for me to go get the card.

**MATOS**: Alright, I'll wait for you.

**RESTO**: The woman works there at 10:30 but I have to go get it. I told her yesterday "Hey, take the money out [Unintelligible]"

**MATOS**: Alright, man.

**RESTO:** [Unintelligible]

[End of Call]

65. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes that **Luis RESTO** called **MATOS** to inform him that he was waiting for an unknown female to provide **Luis RESTO** money so **Luis RESTO** could provide that money to **MATOS**.

66. At approximately 10:18 a.m., an incoming call (call #5210) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **Helbert CALO-BIRRIEL**, utilizing telephone number XXX-XXX-2337. This call was in Spanish. The following is an

English transcript of that call:

**MATOS:** Hello?

**CALO-BIRRIEL:** Hello

**MATOS:** What's up?

**CALO-BIRRIEL:** What's good?

**MATOS:** Uh?

**CALO-BIRRIEL:** What's up?

**MATOS:** [Unintelligible]

**CALO-BIRRIEL:** [Unintelligible] Going there?

**MATOS:** Yes, I'm waiting for Pito to get me something that he needs to bring me and we can go [Unintelligible]. Call Gordo.

**CALO-BIRRIEL:** I called him.

**MATOS:** What he say? What he say?

**CALO-BIRRIEL:** He said at noon.

**MATOS:** 10:30 to 11, noon at the latest.

[Voices Overlap]

**MATOS:** I'm already dressed.

**CALO-BIRRIEL:** [Unintelligible] Now?

**MATOS:** Alright.

**CALO-BIRRIEL:** Are you going to wear the hat?

**MATOS:** Yes, bring it to me.

**CALO-BIRRIEL:** [Unintelligible]

**MATOS:** I have it here [Unintelligible] I've lost them all but check over there.

**CALO-BIRRIEL:** [Unintelligible]

**MATOS:** Alright,

[End of Call]

67. At approximately 11:02 a.m., an incoming call (call #5212) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **Helbert CALO-BIRRIEL**, utilizing telephone number XXX-XXX-2337. This call was in Spanish. The following is an English transcript of that call:

**CALO-BIRRIEL:** Did you call Gordo?

**MATOS:** I don't know, I'm awake, I'm waiting for Pito to bring me that. He already on his way. When Pito brings me that [Unintelligible]…

**CALO-BIRRIEL:** [Unintelligible]

**MATOS:** Lit, give me 40 minutes.

**CALO-BIRRIEL:** Alright

[End of Call]

68. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes that during these telephone calls, **MATOS** indicated he was travelling to New York City later that day, but was waiting for **Luis RESTO**, aka "Pito." **MATOS** instructed **CALO-BIRRIEL** to call **Hector SANTIAGO**, aka "Gordo," to let him know the three were almost ready to leave.

69. At approximately 10:40 a.m., **Luis RESTO** and **John RESTO** returned to the green Buick LeSabre and departed the area of their residence.

70. At approximately 11:08 a.m., your affiant observed **John RESTO** and **Luis RESTO** arrive at **MATOS'** residence in the green Buick LeSabre. **John RESTO** and **Luis RESTO** exited the vehicle, walked to the front porch of **MATOS'** residence, and spoke with **Samuel MATOS**. All three subjects met up on the front porch area of **MATOS'** residence. **Luis**

**RESTO** and **John RESTO** then left the area in the green Buick LeSabre.

71. At approximately 12:17 p.m., your affiant and Det. Phillips observed **Hector SANTIAGO, Helbert CALO-BIRRIEL,** and **Samuel MATOS** exit **MATOS'** residence, enter a maroon Ford Escape, bearing Oklahoma license plate IYJ040, and depart the area.

72. At approximately 12:57 p.m., an outgoing text message (call #5253) was intercepted on **SUBJECT TELEPHONE #4**, between **Samuel MATOS** and an unknown subject, utilizing XXX-XXX-2529. The text message read, "U still need that be back towm 8:30."

73. At approximately 12:57 p.m., an outgoing text message (call #5254) was intercepted on **SUBJECT TELEPHONE #4**, between **Samuel MATOS** and an unknown subject, utilizing XXX-XXX-7944. The text message read, "New shit get here at 8:30."

74. At approximately 12:57 p.m., an outgoing text message (call #5256) was intercepted on **SUBJECT TELEPHONE #4**, between **Samuel MATOS** and an unknown subject, utilizing XXX-XXX-9351. The text message read, "New shit get here tonight."

75. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes that **MATOS** was sending out text messages to his customers/re-distributors stating he would have a new type of heroin available for distribution and he expected to be back in town by 8:30 p.m. and would be able to supply them with the heroin at that time.

76. At approximately 12:58 p.m., Det. Cinque observed **MATOS, CALO-BIRRIEL,** and **SANTIAGO** inside the maroon Ford Escape as it passed the area of Preble, New York, heading southbound on Interstate 81.

77. Agents utilized court authorized geo-location data on **MATOS'** cellular telephone number (**SUBJECT TELEPHONE #4**) to surveil **MATOS** as he travelled south on Interstate 81 and east on State Route 17 towards New York City while driving in the maroon Ford Escape.

78. At approximately 4:57 p.m., the geo-location data indicated that **MATOS** had arrived in the Bronx, New York.

79. At approximately 5:54 p.m., an incoming call (call #5384) was intercepted on **SUBJECT TELEPHONE #4**, between **Samuel MATOS** and an unknown male, utilizing XXX-XXX-5375 (hereinafter, "UM5375"). This call was in Spanish. The following is an English transcript of that call:

**MATOS:** Hello

UM5375**:** What are you on my brother?

**MATOS:** In a burgundy Toyota. I'm here I'm by 2754.

UM5375**:** What are you on?

**MATOS:** Is a burgundy Toyota, [Pause] a Burgundy Ford next to 2754.

UM5375**:** What's the color of your vehicle?

**MATOS:** Burgundy, burgundy, burgundy.

UM5375**:** [Unintelligible]

[Voices Overlap]

**MATOS:** No, red, red red! Burgundy, burgundy.

UM5375**:** Okay

[Voices Overlap]

**MATOS:** I have a motorcycle next to me right now.

UM5375**:** Yes, I know where you are at. I'm looking at you. [Pause] I'm going to get you.

**MATOS:** I'm going to get out so you can see me [Pause] [Unintelligible] [Audio Breaks].

UM5375**:** Okay.

**MATOS:** Can you see me?

UM5375**:** I have to cross the street to see you [Pause] [Unintelligible] [Audio Breaks].

**MATOS:** Okay.

[End of Call]

80. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes UM5375 contacted **MATOS** to see where **MATOS** was. During the call, **MATOS** described his location and vehicle, and UM5375 stated that he could see **MATOS**.

81. At approximately 6:57 p.m., the geo-location data on **MATOS**' cellular telephone indicated **MATOS** was departing the Bronx, New York. Agents continued to monitor the geo-location data from **MATOS**' cell phone, and used this data in connection with physical surveillance, which showed that **MATOS** travelled west on State Route 17 and north on Interstate 81, towards Syracuse, New York.

82. At approximately 10:34 p.m., Det. Rathbun located the maroon Ford Escape, bearing Oklahoma license plate IYJ050, on northbound Interstate 81 near Preble, New York. Around this same time, agents also received geo-location data which confirmed that **MATOS** was in the area of Preble, New York.

83. At approximately 10:42 p.m., an incoming call (call #5436) was intercepted on **SUBJECT TELEPHONE #4**, between **Samuel MATOS** and **John RESTO**, utilizing telephone number XXX-XXX-1352. This call was in Spanish. The following is an English transcript of that call.

**RESTO:** Talk to me. Did you get here?

**MATOS:** [Yawns] No.

**RESTO:** Not yet?

**MATOS:** Not yet. Almost there.

**RESTO:** Are you tired?

**MATOS:** Very tired.

**RESTO:** [Unintelligible]

**MATOS:** That what?

**RESTO:** Did it worked? Did it worked?

**MATOS:** What?

**RESTO:** The guy.

**MATOS:** I think is (50) fifty but I have to put them in the rubber bands.

**RESTO:** How many did he gave you?

**MATOS:** (50) fifty. I have to count them.

**RESTO:** I thought he was going to give you a (100) hundred?

**MATOS:** Yeah, but [Pause] the asshole didn't have everything ready and I didn't want to keep waiting.

**RESTO:** Then he has to bring the rest.

**MATOS:** That's what I told him. "If you want, when I'm almost dry you will have to bring me the other (50) fifty.

**RESTO:** Yeah

**MATOS:** I had to wait there like an extra hour and half [Pause] if not I would have been here earlier.

**RESTO:** [Unintelligible]

[Voices Overlap]

**MATOS:** I would have been here at 9.

[Background: Loud music]

**RESTO:** Going around?

**MATOS:** No, we were parked there.

**RESTO:** [Laughs]

**MATOS:** Dude that place looked so weird.

**RESTO:** What? Those people were acting weird?

**MATOS:** No. But the place was very weird.

**RESTO:** [Unintelligible]

**MATOS:** At the Bronx?

**RESTO:** Yeah, which part?

**MATOS:** I don't know which part. I know was in the Bronx. In the middle. In the ghetto.

**RESTO:** [Giggles] And you were there like no one cares.

[Voices Overlap]

**MATOS:** We were the only ones that looked different. Those people looked weird. They walk weird, they dress weird. They are all going around in Passola's Moped, scooters with batteries.

**RESTO:** [Unintelligible] asshole

**MATOS:** The fuck [Pause] And where are you?

**RESTO:** I'm going home, I'm going to go and get my car.

**MATOS:** I will see you guys tomorrow. I'm going to put rubber bands on these ones and then I'm going to lay down [Unintelligible] at least one [Audio Breaks] [Unintelligible]

**RESTO:** Okay

[End of Call]

84. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes that **MATOS** was on his way back from the Bronx, after purchasing about (50) fifty bricks of heroin, but the heroin still had to be banded together in rubber bands[2]. **John**

[2] Your affiant is aware from her training and experience that heroin is often sold and distributed in

**RESTO** stated that he thought the heroin source of supply was providing **MATOS** "100" bricks of heroin. **MATOS** indicated the heroin source did not have everything ready and **MATOS** got tired of waiting while the heroin was being prepared (i.e. waiting for the quantity of heroin that **MATOS** intended to purchase to be packaged by the source). **MATOS** indicated that he asked the heroin source to have the remaining 50 bricks of heroin delivered to Syracuse. **MATOS** stated he met the source in the middle of the Bronx. **MATOS** and **John RESTO** agreed to meet the following day.

85. At approximately 10:59 p.m., TFO Mosher and Det. Braun observed the maroon Ford Escape park in the area of the **RESTO** residence on Lakeview Avenue. **Hector SANTIAGO** exited the driver's seat. **Helbert CALO-BIRRIEL** exited the rear passenger seat. **Samuel MATOS** exited the front passenger seat. **MATOS** counted a quantity of cash and provided it to **SANTIAGO**. **MATOS** then retrieved a black backpack from inside the Ford Escape. All three men then entered the front door of **MATOS'** residence.

86. At approximately 10:42 p.m., an incoming call (call #5450) was intercepted on **SUBJECT TELEPHONE #4**, between **Samuel MATOS** and **Luis RESTO**, utilizing telephone number XXX-XXX-7957. This call was in Spanish. The following is an English transcript of that call.

**RESTO:** Hello?

**MATOS:** Hello.

**RESTO:** Talk to me [Pause] Where are you?

[Voices Overlap]

---

"bundles" which consist of ten (10) individual baggies of heroin held together by a rubber band. As noted in footnote 4 above, a "brick" of heroin consists of five (5) "bundles" (or fifty (50) individual baggies).

**MATOS:** Sup? I'm getting home now.

**RESTO:** How many did they sold you?

**MATOS:** They sold me fifty but I have to put the rubber band on them because I got them without the rubber band and I think I'm going to do that tomorrow morning when I get up.

**RESTO:** You only got fifty?

**MATOS:** Yes [Background: Unknown Female speaking Unintelligible]. He wanted to give me more, but the asshole didn't have it ready when I got there. So I said I'm leaving the fuck out of here I'm not going to wait. I had to wait like an hour and a half almost two hours.

**RESTO:** What time you got there?

**MATOS:** I got there at 4 and I left at 6:30. I was waiting all that time parked there. I was like "Hey, what's going on? Everything is fine. I got [Unintelligible]." He didn't have anything ready. He didn't have the amount I told him. I told him that if he makes more, if he makes the rest to come down this week. He told me he was going to see if he can find someone. [Pause] So tomorrow when I separate them, I will put them aside.

**RESTO:** Okay

**MATOS:** Okay

[End of Call]

87. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes **MATOS** informed **Luis RESTO** that he was just getting home from New York City. **MATOS** informed **Luis RESTO** that he obtained fifty (50) "bricks" of heroin, but the heroin still had to be repackaged in "rubber bands." **MATOS** explained that the heroin was not ready when he arrived in New York City and he had to wait for the source to prepare it. **MATOS** stated he arrived in New York City at approximately 4:00 p.m. and left at approximately 6:30 p.m. **MATOS** stated the heroin source was going to see if he could find someone to deliver another 50 bricks of heroin to **MATOS** in Syracuse. **MATOS** and **Luis RESTO** agreed

to meet the following day.

88. Based on the observations and intercepted calls detailed above, agents believe the following: **Samuel MATOS, John RESTO, Luis RESTO, Hector SANTIAGO,** and **Helbert CALO-BIRRIEL** combined their money to purchase fifty (50) bricks of heroin. **Hector SANTIAGO** was paid by **MATOS** to drive **MATOS** and **CALO-BIRRIEL** to the Bronx, New York. **MATOS** met with an unidentified source of supply in the Bronx to purchase 50 bricks of heroin. **SANTIAGO** then drove **CALO-BIRRIEL, MATOS**, and the 50 bricks of heroin back to Syracuse, New York. The heroin was then stored at **MATOS'** residence, until it could be processed and redistributed among **MATOS, John RESTO, Luis RESTO, SANTIAGO,** and **CALO-BIRRIEL**. The group expected the heroin source of supply from the Bronx to send an additional 50 bricks of heroin to Syracuse in the near future.

89. On July 22, 2020, at approximately 11:41 a.m., an incoming call (call #5503) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **John RESTO**, utilizing XXX-XXX-1352. This call was in Spanish. The following is an English transcript of that call:

**MATOS:** Hello.

**RESTO:** What are you doing?

**MATOS:** Home.

[Voices Overlap]

**RESTO:** What are you doing dude, I'm coming over you hear me?

**MATOS:** I'm home [Unintelligible].

**RESTO:** What?

**MATOS:** Home.

**RESTO:** Alright, I'm coming right now, I just got up.

**MATOS:** [Unintelligible]

**RESTO:** Huh?

**MATOS:** Let me know.

[End of Call]

90. At approximately 12:07 p.m., your affiant and SA Hardt observed **John RESTO** leave the northwest corner of the **RESTO** residence on Lakeview Avenue, enter the green Buick LeSabre with New York License Plate GJF4593.

91. At approximately 12:28 p.m., your affiant and SA Hardt observed **John RESTO** and **Luis RESTO** arrive at **RESTO** residence on Lakeview Avenue. **MATOS, John RESTO,** and **Luis RESTO** talked on the porch before entering apartment #1. **John RESTO** and **Luis RESTO** departed the area in the Buick.

92. At approximately 1:12 p.m., your affiant and SA Hardt observed **John RESTO** and **Luis RESTO** return to the **RESTO** residence on Lakeview Avenue, where they were observed entering the right side door (downstairs apartment).

93. Based on your affiant's training, experience, and knowledge of this investigation, agents believe **John RESTO** and **Luis RESTO** met up with **MATOS** to retrieve their portion of the heroin supply.

94. On July 31, 2020, at approximately 8:49 a.m., an outgoing call (call #7108) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **Hector Santiago**, utilizing XXX-XXX-9989. This call was in Spanish. The following is an English transcript of the call:

**MATOS:** [Aside: [Unintelligible] [Mumbles]]

[Voices Overlap]

**SANTIAGO:** Hello?

**MATOS:** Hello. Hey, he is going to go there now and he is going to the side door.

**SANTIAGO:** Right now?

**MATOS:** Yes.

**SANTIAGO:** Okay.

**MATOS:** Pay attention. It's a white tall guy with sunglasses. He looks like a cop but he is not a cop.

**SANTIAGO:** But is he going to give me money? Should I give him four or [Pause]?

[Voices Overlap]

**MATOS:** One hundred bucks. He is going to give you one hundred bucks.

**SANTIAGO:** Should I give him four?

**MATOS:** Yes.

**SANTIAGO:** Okay dude.

**MATOS:** Okay.

[End of Call]

95. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes **MATOS** called **SANTIAGO** and directed him to sell a white customer four bags of heroin in exchange for $100.

96. On August 2, 2020, at approximately 9:14 p.m., an outgoing call (call #7620) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **John RESTO**, utilizing XXX-XXX-5466. This call was in Spanish. The following is an English transcript of the pertinent portion of the call:

**RESTO**: Hello?

**MATOS**: Yo.

**RESTO**: Talk to me.

**MATOS**: What are you doing?

**RESTO**: Nothing, I'm at home.

**MATOS**: Okay, so what's up? [Pause] Hey have you got any messages about when the due date is on the phone?

**RESTO**: Huh?

**MATOS**: Have the phone has gotten any messages about the payment due date?

**RESTO**: Not yet.

**MATOS**: Hum [Pause] What have you done?

**RESTO**: I sold two bags [Pause] two bags to the guy with a white van for eight bucks.

**MATOS**: Okay. [Sniffs] Nothing else?

**RESTO**: Nothing else.

**MATOS**: This fucker didn't say anything to me and he left to Boston. He left without saying anything.

**RESTO**: He left yesterday?

**MATOS**: Hum [Pause] until the 15th he said.

[Non pertinent conversation]

**MATOS**: Hey, am I supposed to give you Pito's ticket?

**RESTO**: Yes.

**MATOS**: Okay.

**RESTO**: I have a whole one there and four.

**MATOS**: Okay, the one who have there is mine?

**RESTO**: Huh?

**MATOS**: I said, you have one of mine from him

**RESTO**: Yes [Unintelligible]

[Non pertinent conversation]

**MATOS**: I told him (Gordo) dude, you need to slow down. You already have a debt of three hundred bucks. He is using like [Pause] like [Pause] this is candy.

**RESTO**: He is there all passed out.

**MATOS**: Both of them. They don't use two little bags, no. They use one bundle at a time. [Pause] You heard? One bundle [Background noise] one candy. [Background: Loud noise] [Unintelligible] and I are going to count again [Unintelligible] [Pause]

[Voices Overlap]

**RESTO**: [Unintelligible?]

**MATOS**: Huh?

**RESTO**: What are you saying?

**MATOS**: I said my package, my sneaker's box [Pause].

[Voices Overlap]

**RESTO**: You gave me, you gave me ten bundles from there.

**MATOS**: No, no, no nine disappeared.

[Non pertinent conversation]

**RESTO**: Huh?

**MATOS**: Remember what I sold. [Pause] Hello?

**RESTO**: The [Unintelligible] normal one?

**MATOS**: Remember the first one I sold?

**RESTO**: The first one?

**MATOS**: The first, the first brick I sold.

**RESTO**: Yes, yes.

**MATOS**: [Unintelligible] that's the only one that was sold. Three from Pito and four mines.

[Voices Overlap]

**RESTO**: Yeah.

**MATOS**: Now counting, I see there are some missing. So I was like it is impossible [Unintelligible] [Coughs]

**RESTO**: That's bad.

**MATOS**: Bring me that back because the phone needs to be paid [Coughs].

[Voices Overlap]

**RESTO**: [Unintelligible]

[Voices Overlap]

**MATOS**: [Coughs] bring it back to me

[End of Call]

97. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes **MATOS** and **John RESTO** are talking about how much heroin they have left for distribution. **MATOS** asks **RESTO** if he was supposed to give him "Pito's ticket," (meaning **Luis RESTO's** money). They also talk about a "customer phone" (i.e. a telephone utilized for customer calls) that they share. **MATOS** tells **John RESTO** to bring the phone back because he has to pay the bill for it.

98. On August 5, 2020, at approximately 11:13 a.m., an outgoing call (call #8066) was intercepted on **SUBJECT TELEPHONE #4** between **Samuel MATOS** and **John RESTO**, utilizing XXX-XXX-5466. This call was in Spanish. The following is an English transcript of the call:

**RESTO**: [Unintelligible] I was already on my way

**MATOS**: But do you have the cocaine?

**RESTO**: Yes.

**MATOS**: Alright, I have two people that live around there, [Stammers] that I offered.

**RESTO**: And for the thing, I have to wait for the phone call because that [Unintelligible]…

**MATOS**: So alright then bring me that, try to bring it to me before [Unintelligible].

[Voices Overlap]

**RESTO**: No, I only have three on me.

**MATOS**: Three what?

**RESTO**: The three that you had given me [Aside: [Unintelligible] bro].

**MATOS**: The three loose ones?

**RESTO**: Yes

**MATOS**: [Unintelligible] these people.

**RESTO**: Alright.

[End of Call]

99. Based on your affiant's training, experience, and knowledge of this investigation, your affiant believes **MATOS** and **John RESTO** discuss a quantity of cocaine that **RESTO** possessed. Specifically, **RESTO** tells **MATOS** he has the three loose ones with him (meaning three grams of cocaine).

100. On August 12, 2020, the Honorable Andrew T. Baxter, U.S. Magistrate Judge, signed federal search warrants for several residences, and a vehicle, related to this investigation. One of these locations was a residence on Highland Street, in Syracuse, NY 13203 (**MATOS Residence**).

101. On August 19, 2020, agents executed all of the authorized federal search warrants, including the one at the **MATOS Residence**. The warrant was executed without incident and **Samuel MATOS** was detained inside the residence. Also within the residence was **MATOS'** grandmother and a juvenile.

102. During the search of the **MATOS Residence**, agents recovered approximately 1,090 bags[3] of suspected heroin. These bags were located within a clear Tupperware container inside of a shoebox, on the kitchen floor. The substance was subsequently field tested and indicated positive for the presence of heroin. The total weight of the 1,090 bags of heroin was approximately 42.5 grams.

103. DEA SA Matthew Waters issued **MATOS** his *Miranda* warnings. **MATOS** waived those rights and stated that the heroin seized from his residence belonged to him and to no one else within the residence.

## III. CONCLUSION

101. I believe the foregoing establishes probable cause to believe that defendants **Samuel MATOS, Luis MENDEZ**, **Hector SANTIAGO, Helbert CALO-BIRRIEL, Luis RESTO, John RESTO** and **Jose MEDINA** conspired with each other and others to distribute and possess with intent to distribute controlled substances, to wit: 500 grams or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, and heroin, a Schedule I controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(B), (b)(1)(C), and 846. I respectfully request that the Court authorize the filing of this complaint so that the defendants may be charged and brought to court for further

[3] Your affiant knows from her training and experience that each bag, or glassine envelope, of heroin weighs approximately 0.039 grams.

proceedings in accordance with the law.

Attested to by your affiant.

Respectfully submitted,

Kelly Baart, Task Force Officer
Drug Enforcement Administration

I, the Honorable Andrew T. Baxter, United States Magistrate Judge, hereby acknowledge that this affidavit was attested by the affiant by telephone on August 19, 2020, in accordance with Rule 4.1 of the Federal Rules of Criminal Procedure.

Subscribed and sworn to before
me this 19th day of August 2020

Hon. Andrew T. Baxter
United States Magistrate Judge